UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

DARRYL F. CARL,                                     Case No. 12-10122
                                                    Chapter 7

                              Debtor(s).

DARWIN (HUCK) SPAULDING LIVING
TRUST,

                              Plaintiff(s),
                                                    Adv. No. 12-90078
        v.

DARRYL CARL,

                              Defendant(s).

APPEARANCES:

Ganz, Wolkenbreit & Freidman, LLP              Robert E. Ganz, Esq.
*Attorneys for Plaintiff*                      Lianne Pinchuk, Esq.
One Columbia Circle
Albany, NY 12203

Tully Rinckey, PLLC                            Robert J. Rock, Esq.
*Attorneys for Debtor/Defendant*
441 New Karner Road
Albany, NY 12205

Hon. Robert E. Littlefield Jr., Chief United States Bankruptcy Judge

## MEMORANDUM-DECISION & ORDER

Currently before the court is the adversary complaint filed by the Darwin (Huck) Spaulding Living Trust ("Trust" or "Plaintiff"), a judgment creditor, requesting that the discharge of Darryl F. Carl ("Debtor" or "Defendant") be denied pursuant to 11 U.S.C. §§ 727 (a)(2)(A) and (B), as well as 727 (a)(4)(A).[1] For the reasons set forth below, the court denies the Debtor's discharge.

## JURISDICTION

The court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 157 (a), 157(b)(1),

---

[1] Unless otherwise noted, all statutory references are to Title 11 of the United States Code and all rule references are to the Federal Rules of Bankruptcy Procedure.

1

157(b)(2)(J) and 1334(b). The following constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The court makes the following findings of fact based upon the pleadings and the evidence adduced at the trial held on June 25-26, 2013, as well as the Joint Stipulation of Facts (ECF No. 15) filed by the parties.

1. In 1997, Mr. Carl took title to property located at 43 Carl Lane, Voorheesville, New York (the "Property"). (Joint Stip. ¶4.) Mr. Carl acquired the Property from his mother as a gift and held title in his own name until 2011. (*Id.*) Two structures were built on the Property, a 3,342 square foot home and a pole barn. (Joint Stip. ¶5.) The Property was subject to mortgages held by several different commercial banks between 1997 and 2011. (*Id.*)

2. Over the course of several years Plaintiff loaned money to the Debtor. The aggregation of the loans is evidenced in a promissory note dated August 1, 2010. (Joint Stip. ¶1; Trial Tr. vol. 1, 15 June 25, 2013.) The promissory note is signed by the Debtor personally. (Pl's. Ex. 28.)

3. On June 1, 2011, the Debtor defaulted on the promissory note by failing to make the monthly payment, and the Plaintiff commenced a suit against Mr. Carl in state court. (Joint Stip. ¶2.) A default judgment was entered in favor of the Plaintiff and against the Debtor on November 14, 2011, in the amount of $706,725.52. (Pl's. Ex. 9.) The judgment was docketed with the Albany County Clerk on November 16, 2011 and, thus, constitutes a lien against the Property. (Pl's. Ex. 9.)

4. As of June 2011, there was one mortgage against the Property held by Charter One Bank with an outstanding balance of $297,800.29. (Joint Stip. ¶5, 6; Trial Tr. vol. 1, 25.)

5. On June 8, 2011, Mr. Carl transferred the Property from himself, as sole owner, to himself and his wife, Melissa Carl, as tenants by the entirety (the "Transfer"). (Joint Stip. ¶8.) The consideration for the Transfer was ten dollars. (Pl's. Ex. 2.) On the same date, Mr. and Mrs. Carl borrowed $317,000 from Citizens Bank and secured the loan with a first mortgage against the Property. An

       additional $65,000 was extended to the Carls by the bank in the form of a home equity line of credit. (Joint Stip. ¶10; Trial Tr. vol. 1, 26.) The proceeds of the first mortgage were used to extinguish the Charter One Bank mortgage and cover the closing costs of the loans.

6. Before making the loans to the Carls, Citizens Bank appraised the Property at $505,000. (Joint Stip. ¶7.) The pole barn was inadvertently not included in the appraisal. (*Id.*) Based on the appraisal, prior to executing the Citizens Bank loans, Mr. Carl had $207,000 of equity in the Property. (Joint Stip. ¶8.)

7. On August 17, 2011, Fred Carl's New Salem Garage, Inc. ("New Salem Garage") filed a voluntary bankruptcy petition under Chapter 7. (Case No. 11-12621, ECF No. 1.) The Debtor signed the bankruptcy petition as president of the corporation. Scott T. Dillon, Esq. signed the petition as the corporation's attorney.

8. New Salem Garage ceased operations as of the date of its bankruptcy filing. Prior to seeking bankruptcy protection, New Salem Garage was principally in the business of Saab automobile repairs and sales. (Joint Stip. ¶12.)

9. Albany Speed Shop, Inc. ("Albany Speed Shop" or the "Shop") was incorporated on December 23, 2009. (Joint Stip. ¶13.) The Shop did not conduct business until the summer of 2011. (*Id.*) Melissa Carl is the sole shareholder, director, and officer of the Shop. (*Id.*) According to testimony, the Shop was established in part to protect the Carls in the event that New Salem Garage fell on hard times. (Trial Tr. vol.1, 51.)

10. By late summer 2011, plans were underway to open the Shop to customers. In September 2011, the Debtor helped his wife find a suitable location for the Shop. (Joint. Stip. ¶14.) On September 14, 2011, the Shop executed a three year lease for commercial space. (*Id.*)

11. The Shop was capitalized using $55,000 from the home equity loan the Carls obtained on June 8, 2011. (Joint. Stip. ¶15.) The loan proceeds were transferred from a joint bank account held by the Carls to the Shop's operating account. (Trial Tr. vol. 1, 31, 34.) The remaining $10,000 of the home equity loan was used to pay bankruptcy counsel for New Salem Garage's Chapter 7

3

filing. (Trial Tr. vol. 1, 31.) Thus, by the time the Debtor filed his Chapter 7 petition, the home equity loan had been fully drawn down. (Trial Tr. vol. 1, 30.)

12. Mrs. Carl testified that she put $5,000 of her own money into the Shop as additional capital. (Trial Tr. vol. 2, 19.)

13. The Shop opened for business in October 2011. (Trial Tr. vol. 1, 42.) From October 2011 until late May 2012, the Debtor volunteered at the Shop forty hours per week. (Trial Tr. vol. 1, 43.) During this time, the Debtor was the only person providing services to the Shop without pay. (Trial Tr. vol. 2., 33.) Testimony established that Mr. Carl's services to the Shop and its customers included: setting up the floor plan, installing lift kits and other repair tools before the Shop opened, answering customer questions, writing up repair orders, ordering parts, and repairing cars. (Trial Tr. vol. 1, 42; Trial Tr. vol. 2, 23.) On occasion, the Debtor would fill in for the store manager. (Trial Tr. vol. 1, 50.) Mr. Carl was also involved in both hiring and pricing decisions at the Shop. (Trial Tr. vol. 1, 44.) Occasionally, Mr. Carl was billed out to customers for repair work. (Pl's. Ex. 11.) The Debtor testified that he used the sum of his knowledge and expertise gained at New Salem Garage to assist his wife in starting up the Shop. (Trial Tr. vol. 1, 170.) Mr. Carl also testified that he hoped having his name associated with the Shop would transfer the loyalty of New Salem Garage's customers to the Shop. (Trial Tr. vol. 1, 116.)

14. Prior to her job as owner of Albany Speed Shop, Mrs. Carl worked primarily in administrative positions. At New Salem Garage, Mrs. Carl held the position of "Title Clerk." As Title Clerk, she never worked on cars, priced cars or labor, or served as a manager. (Trial Tr. vol. 1, 167-68.)

15. Beginning in the fall of 2011, Melissa Carl worked forty hours per week at the Shop. (Trial Tr. vol. 2, 20.) She drew a weekly salary of $975.00. (*Id.*)

16. In March 2012, Mrs. Carl took a full-time job with Mangino Buick, a car dealership. Her new job was primarily administrative. (Trial Tr. vol. 1, 168.) After taking the position at Mangino Buick,

4

        Mrs. Carl cut her hours at the Shop to approximately ten hours per week. (Trial Tr. vol. 2, 21.) Her salary, however, remained the same. (Trial Tr. vol. 1, 21.)

17.    Even though the Debtor derives no salary from the Shop, his expenses are paid on an ongoing basis by either his wife or the Shop. The Shop pays for the Debtor's cell phone service. (Trial Tr. vol. 1, 50.) Mr. Carl drives a car paid for by, and in the name of, Mrs. Carl. (Trial Tr. vol. 2, 24.) Since June 2011, the couple's Citizens Bank mortgage is paid solely by Mrs. Carl. (Trial Tr. vol. 2, 24.) All other personal and living expenses of the Debtor are paid from Mrs. Carl's income, which includes her salary from the Shop. (Trial Tr. vol. 1, 50.)

18.    On January 20, 2012 (the "Petition Date"), the Debtor filed a voluntary Chapter 7 bankruptcy petition, Statement of Financial Affairs ("SOFA"), Schedules, and Declaration Concerning Debtor's Schedules (collectively the "Petition"). At the time the Petition was filed, the Debtor was represented by Scott T. Dillon, Esq., the same attorney who represented New Salem Garage in connection with its bankruptcy filing.

19.    Since the Petition Date, there have been no amendments to any of the Schedules or the SOFA filed by the Debtor. (Joint Stip. ¶19.)

20.    On Schedule B ("Personal Property") the Debtor lists that he held "no" contingent or non-contingent interests in the estate of a decedent. (Pl's Ex. 24, at 9.) Under item 21 on Schedule B, when asked to list whether he held any other contingent liquidated claims, the Debtor responded "none." (*Id.*) Under item 35 on Schedule B, the Debtor stated that he had no other personal property of any kind not already listed. (Pl's Ex. 24, at 11.)

21.    On Schedule I ("Current Income of Individual Debtor(s)") the Debtor reports no income, but states that the "Debtor will begin to receive a salary once business beging [sic] to more than cover operating expenses." (Pl. Ex 24, at 20.) Schedule J ("Current Expenditures of Individual Debtor(s)") sets forth that the Debtor is solely responsible for making the $2,600 mortgage payment each month. (Pl's Ex. 24, at 21.)

5

22. Under item 1 of the Debtor's SOFA, he lists income of $5,000 for 2011, and income of $0 for 2012. Under item 2 of the SOFA, the Debtor indicates he has no income other than from employment or operation of a business. Item 3(c) on the SOFA asks the Debtor to list all payments made within one year preceding the filing of bankruptcy to or for the benefit of creditors who were insiders, to which the Debtor replied "none." (Pl's Ex. 24, at 26.) Item 4 on the SOFA requires a debtor to list all lawsuits to which they were a party within one year immediately preceding the filing of the bankruptcy case. The Debtor lists the Plaintiff's state court action and lists the status of the case as "pending." The Debtor testified that he believed that a judgment had been obtained against him by the Plaintiffs in November 2011. (Trial Tr. vol. 1, 18.) He could not recall, however, whether or not he discussed the litigation with his bankruptcy attorney. (Trial Tr. vol. 1, 22.)

23. SOFA item 7, entitled "gifts," requests a listing of all gifts or charitable contributions made within one year preceding the bankruptcy. (Pl's. Ex. 24, at 26.) The Debtor replied "none." At trial Mr. Carl admitted he had failed to provide a copy of the deed transferring the Property to him and his wife to his bankruptcy attorney. (Trial Tr. vol. 2, 57.)

24. The Debtor also replied "none" to SOFA item 10(a) which requires a listing of all property, other than that transferred in the ordinary course of the business or financial affairs of the debtor, within two years immediately preceding the commencement of the case. (Pl's. Ex. 24, at 27.)

25. Under SOFA item 18, the Debtor lists "New Salem Saab" as the only business in which he was a director, officer, partner, or equity holder during the six years preceding the filing of the Petition.

26. On April 7, 2012, the Debtor's mother, Sandra Carl, passed away. Sandra Carl's death occurred within 180 days of the Petition Date. Mr. Carl is a beneficiary of Sandra Carl's estate. (Trial Tr. vol. 1, 35.) The Debtor has not amended the Petition to disclose a possible inheritance.

27. Schedule F ("Creditors Holding Unsecured Nonpriority Claims") lists Sandra Carl, the Debtor's mother, as a creditor holding a claim in the amount of $180,000. The estate of Sandra Carl filed a proof of claim based upon a verbal guarantee given by the Debtor to his mother. (Pl's. Ex. 24, at

6

17.) The proof of claim was withdrawn when the administrator of Sandra Carl's estate realized that the claim could not withstand a statute of frauds defense. (Trial Tr. vol.1, 72.)

## ARGUMENT

The Plaintiff asserts that the Debtor's discharge should be denied pursuant to §727(a)(2)(A) or (B) because the Debtor intentionally concealed his assets, as well as assets of the estate, from creditors. The Trust argues that the Transfer, as well as an equitable interest in the Shop, were concealed with the intent to defraud creditors.

Plaintiff also asserts that Debtor's discharge should be denied under § 727(a)(4). The Trust contends that the proof shows that the Petition contains a series of material errors which were either made fraudulently, or with a reckless disregard for the truth. Plaintiff argues that the failure to list the Transfer, failure to explain the relationship between Mr. Carl and the Shop, and misstatements regarding the mortgage payments and the legal status of the Trust's state court lawsuit support a denial of discharge under § 727(a)(4).

The Debtor maintains that the Plaintiff failed to demonstrate intent to delay or defraud creditors under §727(a)(2). The Defendant also challenges the notion that he is an equitable owner of the Shop. The Debtor defends the §727(a)(4) cause of action by asserting that he reasonably relied on counsel. Accordingly, the Debtor contends that the Plaintiff has not established the requisite intent under §727(a)(4).

## DISCUSSION

### I. Denial of a Discharge

A denial of discharge is "an extreme penalty for wrongdoing." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996). It is the "death penalty of bankruptcy." *Washington 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009) (citing *Levine v. Raymonda (In re Raymonda)*, No. 99-13523, Adv. Pro. No. 99-91199, slip op. at 4 (Bankr. N.D.N.Y. Feb. 16, 2001). Because of the severity of the sanction, § 727 is construed strictly against the objecting party and liberally in favor of the debtor. *In re Chalasani*, 92 F.3d at 1310. An objecting party

7

must prove the essential elements of each §727(a) cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289 (1991). Although the sanction under §727 is harsh, a discharge is reserved for the honest but unfortunate debtor and its price is full and accurate disclosure in the petition and schedules. *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 234 (2d Cir. 2006).

## II.     Denial of a Discharge under § 727(a)(2)(A)

Section 727(a)(2)(A) provides that "[t]he court shall grant the debtor a discharge, unless the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727 (a)(2)(A). In order to prevail under §727(a)(2)(A) the Plaintiff must prove: (1) that the Debtor; (2) transferred or concealed property; (3) that the act complained of was done to property owned by the debtor; (4) with actual intent to hinder, delay or defraud a creditor; and (5) that the act complained of was done within one year of the Debtor filing their bankruptcy petition. *See Minsky v. Silverstein (In re Silverstein)*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993) (citing 4 *Collier on Bankruptcy*, Sec. 727.02 at 727-11-12 (15th Ed. 1998)).

To establish a § 727(a)(2) cause of action, the plaintiff must demonstrate an *actual* intent to hinder, delay, or defraud; constructive intent is insufficient to deny a discharge. *Bank of Pa. v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976) (emphasis added). Direct proof of fraudulent intent is often unavailable. *In re Boyer*, 328 Fed. Appx. 711, 715 (2d Cir. 2009). As a result, courts have developed badges of fraud, which allow for circumstantial proof to demonstrate the necessary intent. In the Second Circuit the badges of fraud include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or other close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

8

*In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).

As with "other aspects of the evaluation of evidence, determinations concerning fraudulent intent are questions of fact that depend largely upon an assessment of the credibility and demeanor of the debtor." *Credit Corp. I v. Boyer (In re Boyer)*, 367 B.R. 34, 45 (Bankr. D. Conn. 2007) (internal quotation marks and citations omitted).

### *Transfer of Debtor's Interest in 43 Carl Lane*

The Trust's first theory under § 727(a)(2)(A) is that the Transfer was intended to hinder, delay, or defraud creditors. It is undisputed Mr. Carl, while insolvent, transferred his home from himself, as sole owner, to himself and his wife. (Joint Stip. ¶9.) According to the Debtor's testimony, he knew that prior to the Transfer, he had substantial equity in his home. (Trial Tr. vol. 1, 172.) This equity was transferred to his wife for no consideration. (Joint Stip. ¶9.) The only element of § 727(a)(2)(A) disputed by Mr. Carl is the fourth, namely, that he did not have the requisite intent needed to deny him a discharge.

Transactions between husband and wife must be closely scrutinized to assure that they are fair and honest and not merely contrivances resorted to for the purpose of placing a spouse's property beyond the reach of creditors. *Laines v. Gold*, 352 B.R. 397, 404 (Bankr. E.D. Va. 2005). Transfer of property by a debtor to his spouse, during a period of insolvency, while retaining use and enjoyment of the property, is a classic badge of fraud. *In re Kaiser*, 722 F.2d 1574, 1582. Here, after the Transfer, Mr. Carl continued to live in the home, while Mrs. Carl made the monthly mortgage payments.

The timing of the Transfer is particularly troubling. The Debtor's finances in June 2011 were bleak. In May 2011, New Salem Garage's financial situation was rapidly deteriorating. (Trial Tr. vol. 1, 14.) Mr. Carl was the personal guarantor of several of New Salem Garage's debts. (Trial Tr. vol. 2, 43.) By June 2011, it was clear that several of these debts would not be repaid and litigation could easily be anticipated. The Debtor defaulted on his payments to the Trust in June 2011. This default quickly turned into a lawsuit and, by November 2011, a judgment against the Debtor. New Salem Garage filed for bankruptcy protection on August 17, 2011, ceasing all operations and cutting off the Debtor's income.

9

The Transfer, coupled with his loss of employment, rendered Mr. Carl judgment proof just as his creditors were turning to the courts for relief.

The Debtor offers two explanations for the Transfer. First, the Transfer was for estate planning purposes. Second, the Transfer was necessary to refinance the existing mortgage on the Property. These explanations fall short. Mrs. Carl testified, in conclusory fashion, that she placed her name on the title for estate planning purposes. She indicated that they worried that if Mr. Carl suddenly became incapacitated, she could lose the home. (Trial Tr. vol. 2, 13.) Mrs. Carl, however, conceded at trial that the couple had not taken any steps to get their affairs in order. (*Id*.) Given the record, the court cannot credit the explanation that the Transfer was for estate planning purposes.

The refinancing explanation is similarly unpersuasive. Mrs. Carl testified that she was added to the title so that the couple could refinance the mortgage. (Trial Tr. vol. 2, 14-15.) The Debtor, however, put forward no evidence to show that favorable lending terms could not be obtained without adding Mrs. Carl to the title. Mr. Carl also failed to address the Trust's argument that the refinancing made little sense economically. After refinancing, the Carls' yearly mortgage and tax payments rose from approximately $19,000 to over $31,000. (Trial Tr. vol. 2, 16.) All of this suggests an ulterior motive for the refinancing and supports a finding of the requisite fraudulent intent needed to satisfy § 727(a)(2)(A).

Based upon the totality of the circumstances surrounding the Transfer, the court finds the Plaintiff carries its burden under §727(a)(2)(A).

*Equitable Ownership of Albany Speed Shop*[2]

It is clear that Mr. Carl is not a legal owner of the Shop; however, courts have held that a debtor has an equitable interest in property "if the debtor has transferred title under suspicious circumstances . . . such as after a debtor has suffered a money judgment or otherwise is under financial pressure, but nevertheless retains attributes of beneficial ownership." *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 571 (Bankr. S.D.N.Y. 2005) (quoting *Cadle v. Ogalin (In re Ogalin)*, 303 B.R. 552, 557-58 (Bankr.

---

[2] The Plaintiff need only prevail on one of its causes of action in order to deny the Debtor's discharge; however, in the interest of completing the record, the court will address the Plaintiff's remaining causes of action.

D. Conn. 2004)).  In evaluating whether or not a debtor has a beneficial interest in a business, courts engage in a multi-factor analysis.  First, courts consider whether a debtor previously owned a similar business.  *In re Ogalin*, 303 B.R. at 555.  Second, courts look to see whether the debtor left his previous business venture under financial duress.  *Id*. at 555-57; *In re Klutchko*, 338 B.R. at 571.  Third, and most importantly, courts examine whether the debtor transferred his or her salary, or the right to receive salary to a family member or to a business entity owned by an insider.[3]  *Coady v. D.A.N. Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1314 (11th Cir. 2009); *In re Ogalin*, 303 B.R. at 555-56; *In re Klutchko*, 338 B.R. at 571; *In re Frumovitz,* 10 B.R. 61, 65-66 (Bankr. S.D. Fl. 1981); *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 693-95 (Bankr. S.D.N.Y. 1996); *In re Winik*, 39 F. Supp. 3, 4 (D.N.J. 1941).  Fourth, courts evaluate whether the debtor is actively and actually involved in the success of the insider business.  *In Re Frumovitz*, 10 B.R. at 66; *In re Coady*, 588 F.3d at 1314.  Finally, the debtor must retain some of the benefits of the salary, such as having expenses paid for by the insider or the business.  *In re Coady*, 588 F.3d at 1314; *In re Klutchko*, 338 B.R. at 571.  Even if these factors are present, a court may grant a discharge if the debtor demonstrates a legitimate reason for the insider business relationship.  *Old Nat'l Bank v. Reedy (In re Reedy)*, 169 B.R. 28, 30 (Bankr. E.D. Va. 1994) (discharge was granted where the debtor's wife established a corporation because her husband was unable to maintain his consulting business without her help.)

   Each of the factors above weigh in favor of finding that the Debtor is an equitable owner of the Shop.  First, the Debtor was the owner of New Salem Garage, a business in many respects similar to Albany Speed Shop.  Second, Mr. Carl transitioned between New Salem Garage and the Shop while he was under tremendous personal financial pressure.  Looking to the third factor, it is clear that Mr. Carl transferred his right to receive a salary to Albany Speed Shop and, by extension, to his wife.  The Debtor spent seven months working forty hours per week at the Shop without receiving a paycheck.  During this time he was the only employee not receiving compensation.  (Trial Tr. vol. 2, 33.)  Mr. Carl submits that he was to be paid once there was adequate cash flow, however, Albany Speed Shop was actively hiring in

---

[3] As defined at § 101(31).

11

the fall of 2011, while Mr. Carl was working gratis. (Trial Tr. vol. 1, 49; Pl's Ex. 23.) Meanwhile, Mrs. Carl earned twice the salary from the Shop as she had from New Salem Garage; her salary was not reduced even after she took a new job which significantly reduced her hours at the Shop.

The fourth factor, that the Debtor was actually and actively involved in the business of the Shop, is also satisfied. Mr. Carl testified that he helped answer customers' questions, wrote up repair orders, ordered parts, and occasionally worked on cars. (Trial Tr. vol. 1, 42.) Mr. Carl used his expertise as a car shop owner to help design the layout of Albany Speed Shop. (Trial Tr. vol. 1, 41, 42.) The Debtor filled in for the manager when he was on vacation. (Trial Tr. vol. 1, 50.) Mr. Carl's time was billed out to customers as a repair technician. (Trial Tr. vol. 1, 43-44; Pl's. Ex. 13.) He also helped his wife make hiring and pricing decisions at the Shop. (Trial Tr. vol. 1, 44.)

Mrs. Carl never explained how her previous experiences qualified her to run the Shop. At both New Salem Garage and Mangino Buick, her duties were administrative. She had no prior experience as a manager or owner. (Trial Tr. vol. 1, 167, 168.) On the other hand, Mr. Carl's expertise as a car shop owner is readily apparent; his job at New Salem Garage, which he held for twenty years, was virtually identical to Mrs. Carl's position at the Shop. (Trial Tr. vol. 2, 45, 46.) The Debtor counseled his wife through many of the decisions she made as a business owner–functioning essentially as a co-owner in the early days of the Shop. Further, Mr. Carl believed that his service to the Saab community and association with the Shop would help it grow. (Trial Tr. vol. 1, 116.) Testimony established that Mr. Carl was every bit as essential in the early success of Albany Speed Shop as Mrs. Carl.

Turning to the final factor, there is no question that Mr. Carl retained some of the benefits of a salary during the fall of 2011. Until Mr. Carl began to receive a minimum wage salary in February 2012, Mrs. Carl's salary was the couple's sole income. She paid all of the Debtor's living expenses, as well as the mortgage on the family home. Additionally, the Shop paid directly for Mr. Carl's cell phone plan. Without Mrs. Carl paying everyday expenses, the employment arrangement would never have worked for the couple.

The court cannot find a plausible justification for Mr. Carl's employment arrangement. There was no testimony explaining why Albany Speed Shop, Inc. was formed with Mrs. Carl as its sole shareholder. By all accounts Mr. Carl was a competent manager at New Salem and could have done an equally respectable job at a new venture. New Salem failed because of choices of third party vendors, not as a result of Mr. Carl's management. In fact, the testimony demonstrated that Mrs. Carl relied heavily on her husband's experience and expertise when making management decisions.

The consequences of the relationship between the Debtor and Albany Speed Shop are clear. The sweat equity of Mr. Carl, as well as any goodwill that was transferred by his association with the New Salem Garage, increased the value of Albany Speed Shop. Increases in the value of the Shop enhance the value of Mrs. Carl's ownership. Because Mrs. Carl was paying for all of the Debtor's expenses, he saw an indirect benefit resulting from any increase in value of Albany Speed Shop. Based on these facts, the court finds Mr. Carl has an equitable ownership interest in Albany Speed Shop.

The Plaintiff, having established that the equitable interest exists, must demonstrate that it was concealed. Concealment is sufficient to establish a case under §727(a)(2). *McCormick v. Security State Bank*, 822 F.2d 806, 808 (8th Cir. 1987). Concealment refers to concealment of a property interest, not a concealment of the transfer itself. *U.S. v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984). Concealing "property for the purposes of § 727(a)(2) . . . can be accomplished by a transfer of title coupled with the retention of the benefits of ownership." *In re Olivier*, 819 F.2d 550, 553 (5th Cir. 1987); *see San Jose v. McWilliam*, 284 F.3d 785, 794 (7th Cir. 2002) ("[T]he transfer of title with attendant circumstance indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment." (internal citations omitted)). Courts have found concealment of an equitable interest when the debtor diverts "the fruits of his industry to . . . family members, who then provided him with the use and enjoyment of material comforts purchased with those fruits." *In re Coady*, 588 F.3d at 1316. Such a debtor could devote his time and talent to increasing the business's value, but "whatever increase in equity came about in the future through his labor would be protected from his creditors" while still being available for the debtor's benefit. *Id.* at 1315.

13

Concealment, for purposes of the Trust's § 727(a)(2)(A) cause of action, hinges entirely on the court's determination of whether or not an equitable interest exists in the first instance. Because the court has made a finding that Mr. Carl had an equitable interest–it follows that this interest was concealed from creditors. Although title of New Salem Garage was not formally transferred, the Debtor accomplished the same result by setting up a new legal entity solely in his wife's name. Therefore, Mr. Carl concealed his interest in the Shop.

The final question under § 727(a)(2)(A) is whether the Debtor possessed the requisite fraudulent intent. Concealment of the equitable interest in the Shop bears many of the same badges of fraud as the Transfer above. The family relationship between Mr. and Mrs. Carl and retention of beneficial use by the Debtor are both present. In addition, Albany Speed Shop began doing business in fall of 2011, while the Debtor was insolvent. The court is persuaded, based on the totality of the circumstances, that the Debtor possessed the requisite fraudulent intent.

Accordingly, the Plaintiff has satisfied its burden for establishing the requisite elements under § 727(a)(2)(A).

### III.    Denial of a Discharge under § 727(a)(2)(B)

Under § 727(a)(2)(B) the court may deny a debtor's discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of filing of the petition. 11 U.S.C. § 727(a)(2)(B). To prevail under § 727(a)(2)(B) the Plaintiff must prove that: (1) the debtor, (2) transferred or concealed (3) property of the bankruptcy estate (4) with the intent to hinder, delay or defraud the creditor (5) after the filing of the bankruptcy petition." *In re Pisculli*, 408 Fed. Appx. 477, 479 (2d Cir. 2011). The motivating factors are read in the disjunctive, an objecting party need only show that the debtor intended to hinder, delay, *or* defraud to carry their burden. *In re Rowe*, 234 F. Supp. 113, 116 (E.D.N.Y. 1965) (emphasis added). An objecting party does not need to prove that creditors were actually harmed to meet its burden. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010).

Property of the estate includes all legal and *equitable interests* of the debtor in property as of the commencement of the case. 11 U.S.C. § 541 (a)(1) (emphasis added). Section 541 is broadly construed to "include all property interests, whether reachable by state-law creditors or not, and whether vested or contingent, this definition draws into the estate all of the debtor's property interests as of the filing date." *United States v. Rauer*, 963 F.2d 1332, 1337 (10th Cir. 1992). It is irrelevant whether a debtor has possession or title of the property in question, all that matters is whether the debtor has an interest in the property.

Property of the bankruptcy estate is inclusive of all property interests of the debtor. Nothing in the record distinguishes the Debtor's pre-petition equitable interest in the Shop for purposes of § 727(a)(2)(A) from property of the estate for § 727(a)(2)(B) purposes. Therefore, once Mr. Carl filed for bankruptcy relief, the concealment of the equitable ownership of the Shop continued into the post-petition period.

Accordingly, for the reasons enumerated above, the Trust carries its burden under § 727(a)(2)(B) as well.

### IV.    Denial of a Discharge under § 727 (a)(4)

The Plaintiff also seeks to deny the Debtor's discharge under § 727(a)(4)(A). A discharge will not be entered if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). In order for the court to deny a debtor a discharge under § 727(a)(4)(A) a plaintiff must establish that "(1) the debtor made a statement under oath, (2) such statement was false, (3) the debtor knew the statement was false, (4) the statement was made with fraudulent intent, and (5) the statement related materially to the bankruptcy case." *Levine v. Hormovitis (In re Hormovitis)*, No. 07-11276, Adv. Pro. No. 07-90212, slip op. at 6 (Bankr. N.D.N.Y. Apr. 27, 2009) (citations omitted). Once the plaintiff meets their initial burden to produce evidence of a false oath, the burden of production shifts to the debtor to produce a "credible explanation." *Adler v. Ng (In re Adler)*, 395 B.R. 827, 841 (Bankr. E.D.N.Y. 2008). The ultimate burden of proof, however, remains with the plaintiff. *Id.*

The first and second elements of §727(a)(4) are not in dispute. The petition is signed under penalty of perjury, which is the equivalent of an oath. *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994). Mr. Carl admits in his testimony that the Petition contains errors, which satisfies the second element. (Trial Tr. vol. 2, 60.) Moving to the element of knowledge—the Debtor gave uncertain testimony regarding a number of items in the Petition. (Trial Tr. vol. 1, 116-121.) On cross examination, the Debtor admitted that he was confused about portions of the Petition when he signed it. (Trial Tr. vol. 1, 151.) The Debtor admitted that he had noticed inaccuracies in the Petition when he reviewed it with his bankruptcy attorney, however, he never brought the errors to his attorney's attention prior to filing. (Trial Tr. vol. 1, 23.) If a "debtor plays *any* role in the publication of the false disclosure or omissions itself . . . then such debtor has made a false oath in the form of such false disclosure or omissions . . . the debtor exhibits a reckless indifference to the truth, which . . . is the equivalent of fraud." *Bohm v. Dolata (In re Dolata)*, 306 B.R. 97, 149-50 (Bankr. W.D. Pa. 2004) (emphasis added) (citations omitted). Once Mr. Carl noticed errors or inconsistencies in the Petition, he had a duty to bring them to his attorney's attention. A debtor will not avoid liability by sheltering away the knowledge of falsity of his statements. Accordingly, the third element is satisfied.

The fourth element of a §727(a)(4)(A) requires the plaintiff to prove intent. As with § 727(a)(2), § 727(a)(4)(A) requires proof of actual intent, not merely constructive intent. *In re Kelly*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992). Fraudulent intent may be shown through circumstantial evidence or inferences from a course of conduct, all surrounding circumstances, and any evidence of a course of conduct. *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983); *In re Saphire*, 139 F.2d 34, 35 (2d Cir. 1943). A series of misstatements in a petition and schedules support a finding of fraudulent intent. *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969). Such omissions and misstatements can amount to a reckless disregard for the truth, which the Second Circuit equates with actual fraud. *Id.* There is substantial overlap between § 727(a)(4)(A) and §727(a)(2) causes of action. *See In re Klutchko*, 338 B.R. at 570 ("The standard necessary to support a finding of knowingly making a false statement with the intent to defraud is, for all practicable purposes, identical to the standard required to support a

16

finding of fraudulent intent under § 727(a)(2)." (quoting *C&H Electrical v. Newell (In re Newell)*, 321 B.R. 885, 892 (Bankr. N.D. Ohio 2005))).

Proof at trial demonstrated that a number of the statements on the Petition were false at the time of filing: the Transfer was without consideration and, thus, a gift; the Huck Spaulding state court case was no longer pending; and the relationship between Mr. Carl and the Shop was not disclosed. Additionally, subsequent to the bankruptcy filing, Mr. Carl became entitled to a substantial inheritance. His schedules were never amended to reflect the inheritance. These misstatements are not trivial. They are, at the least, made with reckless disregard for the truth, establishing the fourth element under § 727(a)(4).

The fifth element under § 727(a)(4)(A) requires that the false oath be material to the bankruptcy. Materiality is a low threshold. If a false oath is related to the debtor's "business transactions or estate or concerns the discovery of assets, business dealings or the existence or disposition of his property" then the statement is material. *O'Connell v. DeMartino (In re Demartino)*, 448 B.R. 122, 129 (Bankr. E.D.N.Y. 2011) (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). There is no requirement that the plaintiff prove prejudice in order to prove materiality. *Morris Plan Industrial Bank v. Finn*, 149 F.2d 591, 592 (2d Cir. 1945). The Debtor's misstatements deal, in part, with his ownership of a business as well as transactions with insiders and a potential asset. These misstatements are material.

Based upon the foregoing, the burden has shifted to the Debtor to offer a credible explanation for any misstatements. Mr Carl makes two arguments to explain his mistakes. First, he contends that he relied on the advice of bankruptcy counsel when preparing the Petition. Advice of counsel is a complete defense to charge of fraud when a debtor makes a full and fair disclosure of facts to their counsel. *Colish v. United States*, 289 B.R. 524, 542 (Bankr. E.D.N.Y. 2002). Such reliance must be in good faith. Any protection based upon reliance on counsel acts as a defense only to the extent the reliance was reasonable. *Id.* Debtor's counsel can only give sound advice if fully informed of the relevant facts. *In re Mascolo*, 505 F.2d 274, 276-77 (1st Cir. 1974). When a debtor withholds pertinent facts and information from his or her attorney, they are not entitled to an advice of counsel defense. *Id.* Courts do not permit a debtor to

17

play ostrich, burying his head in the sand and then disclaim all responsibility for statements which he made under oath. *Boroff v. Tully (In re Tully)*, 818 F.2d 106 (1st Cir. 1987).

      Mr. Carl has not convinced the court that he had a frank and honest discussion with his original bankruptcy counsel. Instead the court believes that vital factual information was withheld from Debtor's counsel. For each material inaccuracy, the Debtor could not recall the substance of conversations with his attorney. Mr. Carl could not remember whether he discussed using the 2011 home equity loan to fund the Shop. Mr. Carl testified that such information would be important to creditors but could not explain why he never told his attorney. (Trial Tr. vol. 2, 62-63.) The Debtor stated that he was "sure" he provided the deed showing the transfer of 43 Carl Lane to his prior counsel. However, when confronted with his prior deposition testimony stating that he "did not recall," the Debtor changed his testimony. (Trial Tr. vol. 2, 56-57.) Testimony also established that Mr. Carl failed to discuss the Trust's state court action with his attorney. (Trial Tr. vol. 1, 152.) Because Mr. Carl has not demonstrated that he fully disclosed his financial condition to his attorney, the court cannot give credit to an advice of counsel defense.

      Separately, Mr. Carl argues that the Plaintiff has not demonstrated fraudulent intent because under Bankruptcy Rule 1009(a) he may amend his schedules at any time before his case is closed and, therefore, nothing in the Petition is "false." A failure to amend schedules can give rise to an inference of fraud. *Britton Motor Service v. Krich*, *(In re Krich)*, 97 B.R. 919, 923 (Bankr. N.D. Ill. 1988) (indicating that failure to promptly amend schedule to reflect omitted assets is indicative of knowing and fraudulent conduct). Failure to amend a petition after inconsistencies are raised has been held to be reckless indifference to the truth. *In re Dolata*, 306 B.R. at 144. Although amendments can cure defects in petitions, they are not evidence of innocent intent in a § 727 action "where the debtor has changed his testimony or amended his schedules only after the trustee or creditors have already discovered what the debtor sought to hide or when the change in testimony or amended schedules are precipitated by the trustee's persistence in uncovering the truth." *In the Matter of Kilson*, 83 B.R. 198, 203 (Bankr. D. Conn. 1988).

18

The Debtor argues that his right to amend his schedules under Rule 1009, at the very least, is a complete defense for his failure to amend his schedules to disclose his inheritance. A bankruptcy estate includes "any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 after such date–by bequest, devise, or inheritance." 11 U.S.C. § 541(a)(5)(A). Bankruptcy Rule 1007(h) provides that if the "debtor acquires or becomes entitled to acquire any interest in property, the debtor **shall** within 14 days after the information comes to the debtor's knowledge or within such further time the court may allow, file a supplemental schedule in the chapter 7 liquidation case . . . ." Fed. R. Bankr. P. 1007(h) (emphasis added).

The court is unpersuaded that there is any tension between Rule 1009 and Rule 1007 which might lead a debtor to fail to file the required amended schedules. However, to the extent there is any tension between Rules 1007 and 1009, the doctrine of statutory interpretation *generalia specialibus non derogant*—general provisions do not qualify specific ones—resolves the issue. *See Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 301 (2d Cir. 2002). While Rule 1009(a) grants a broad right to amend as a matter of course, Rule 1007 lays out a specific amendment criteria when a debtor comes into an inheritance. The text of Rule 1007 does not contain any language abrogating Rule 1009. It is clear that Rules 1007(h) and 1009 are to be read in concert and that the post-petition inheritance should have been promptly disclosed. Accordingly, the Debtor's argument that he may still amend his schedules and defeat the Trust's § 727(a)(4) is not well founded.

Mr. Carl has failed to provide an adequate explanation for his actions, and failed to meet his burden of going forward with the evidence. Because the Plaintiff met its burden, Mr. Carl's discharge is denied under § 727(a)(4)(A).

## CONCLUSION

For the reasons stated above, judgment is granted in favor of the Plaintiff as to § 727(a)(2)(A) and

(B) and § 727(a)(4)(A), and the Debtor is denied a discharge.

It is SO ORDERED.

Dated:  September 2, 2014                              /s/Robert E. Littlefield, Jr.
        Albany, New York                               Hon. Robert E. Littlefield, Jr.
                                                       Chief United States Bankruptcy Judge